GORDON, STROBEL & LAUREAU et al. v. CARNEGIE STEEL CO. et al.

(Circuit Court, W. D. Pennsylvania. November 3, 1903.)

No. 7.

1. PATENTS—INFRINGEMENT—FURNACE PROTECTING.
  The Gordon, Strobel & Laureau patent, No. 358,604, for furnace protecting, relating to the preservation of the lining of pig-iron blast furnaces, in view of its terms and the prior art, is limited to a furnace construction in which the furnace wall has a peripheral groove therein, divided by metallic partitions into a continuous series of pockets, in which are placed hollow coolers for the circulation of water, practically end to end, and it is not infringed by a construction following the Fronheiser type, previously in use, in which the pockets are separated by substantial brick piers.

In Equity. Suit for infringement of letters patent No. 358,604, for furnace protecting, granted to Gordon, Strobel & Laureau March 1, 1867. On final hearing.

Wm. L. Pierce, for complainants.

John R. Bennett, Bakewell & Byrnes, and Kay & Totten, for respondents.

BUFFINGTON, District Judge. This bill is filed to enjoin alleged infringement of claim 1 of patent No. 358,604, granted March 1, 1887, to Gordon, Strobel & Laureau, for furnace protecting. The patent concerns the preservation of the lining of pig-iron blast furnaces. The brick linings of such furnaces are subject to rapid deterioration by reason of high heat, chemical action of the melting, and the attrition and dropping of the batch. To counteract such destructive heat, means for cooling the interior walls of the stack have been devised. The patent in suit is one of such. Prior to its date, two types of furnace construction were employed. One was the Fron-

heiser box method. In it parallel belts of peripheral pockets were constructed in the breast of the furnace wall, having exterior openings outwardly, and their rear near the heat-exposed surface of the wall. These pockets were noncontinuous, in that piers of brickwork, from 10 to 12 inches in width, constituted an integral part of the wall between the pockets. In each of the latter a hollow bronze box, having an inlet and outlet pipe, was fastened, a circulation of water near the inner wall of the furnace thereby maintained, and the destructive effects of heat proportionately counteracted. The box being slotted at the top, the water was not under pressure. This Fronheiser practice has been in constant and successful use at the Cambria Ironworks since 1884. This system, it will be observed, permitted of a removable cooler. The pocket in which the box was placed was an integral part of the furnace wall, and, as such, its walls were affected by contraction and expansion influences in like degree with the furnace walls. It will also be noted that this type of cooler was noncontinuous, in that the interior furnace wall opposite the piers was not subjected to the cooling action of the boxes. The other type of construction is shown in the patent to Kennedy, No. 378,550, of February 28, 1888, where the coolers form a practically continuous peripheral cooling belt, but, being built into the wall, they are irremovable. It will thus be seen that the Kennedy system had the advantage of continuity, but coupled with the limitation of nonremovability, while the Fronheiser had the advantage of removability, but coupled with the limitation of noncontinuity. By the patent in suit the patentees sought to unite the advantages of both continuity and removability in a single structure. This device consisted in dividing the furnace wall into two separate, integral parts by a peripheral, metal-lined groove. To support the upper furnace wall, relatively narrow metal pins or supports were placed at intervals in the groove. In the spaces between these legs or pins, removable coolers were set. The legs or partitions were so narrow that the coolers practically abutted each other, and formed a continuous cooling belt or zone. The features of continuity and removability, and securing them by the use of a peripheral groove, caused by a break and separation of the upper and lower wall, are pointed out in the specification, and embodied in the claim here involved. Thus the specification says:

"C, a deep, outwardly opening groove in the wall, extending entirely around the furnace, such groove being produced in practice by building the brickwork over box-like castings which form the permanent lining of the groove; D, a series of segmental plates resting upon the floor of the wall-groove; E, a series of segmental plates forming the roof lining of the wall-groove. * * * F, radial partitions in the groove, formed by downwardly projecting flanges at one end of each of the roof plates, these flanges extending the full depth of the groove and plates; G, shallow legs projecting downward at the outer edge of each roof plate immediately between the partitions, F, these legs resting upon the floor plates, and serving to support the outer edge of the roof plates. * * * When the wall has reached the height at which it is proposed to insert the coolers, the floor plates, D, are laid upon the wall. * * * The wall work is then continued and built over the plate work. * * * It should be understood that the object of the plates, partitions, etc., is to compensate for the weakness of the grooved wall. * * * The plate work thus serves to form a metal lining for the groove, to divide the groove into a circumferential series of pockets, and to support the wall work above.

\* \* \* The wall is protected from destruction by the circulation of water or other cooling medium through the hollow inner edges of the coolers, which form an almost continuous circular line with the wall, being interrupted only at the partitions, F."

As stated, these features, to wit, removability and continuity, in substance, are embodied in claim 1:

"(1) In a furnace, a furnace wall provided with a peripheral groove having its exterior opening outwardly, and with its interior near to the heat-exposed surface of the wall, vertical partitions serving to divide said groove into a continuous series of pockets, hollow coolers disposed one in each of said pockets, and adapted to be removed separately outward therefrom, and pipes connected to the hollows of the coolers, and adapted for the passage of the cooling medium, combined substantially as and for the purpose set forth."

Now, a "groove" is defined as "a furrow, channel, or long hollow," and, as the claim calls for "a peripheral groove," as the partitions serve "to divide said groove into a continuous series of pockets," and as the specification states the hollow inner edges of the coolers form "an almost continuous circular line with the wall," we are justified in concluding that the groove of the patent claim was one whose channel or hollow was unbroken by any such substantial pier or cross-section as would divide it into a noncontinuous series of pockets. The respondents, in the alleged infringing structure, have followed the lines of Fronheiser, in that they retained continuity of furnace wall; have made individual, separated, noncontinuous pockets, and used brick piers of substantial size between them. While the coolers used are removable, there is no peripheral groove in the furnace wall, and, as a result, these coolers are noncontinuous. It is true, respondents do not use the Fronheiser box; but the form of wall, not the type of cooler construction, is the point here at issue. The similarity of wall construction between the respondents' and Fronheiser's is such that, in our judgment, to decree the former to infringe would necessitate holding the latter to anticipate. The patentees have described a peripheral, wall-breaking groove in their specification; they have embodied "a peripheral groove" in their claim—a limitation, we think, necessitated by the prior art—and they must be restricted thereby. This element the respondents do not employ. Their piers, especially at the inner end, where they serve to prevent cooler continuity, are of material proportions, and stamp their wall recessed pockets as of the Fronheiser type. We are therefore of opinion that the bill should be dismissed on the ground of noninfringement. This view renders it unnecessary to here discuss the two remaining defenses, viz., nonutility of the patented device, and delay in the assertion of complainants' rights. Upon these we express no opinion, but we deem it proper to say that our refraining from discussing and deciding the same must not be regarded as minimizing their possibly grave character as objections to a successful maintenance of this suit.

Let a decree be drawn dismissing the bill for noninfringement.